# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| BRUCE HARRIS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 16-0162 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 17, 19 |
| | : | | |
| ELAINE L. CHAO,[1] Secretary, | : | | |
| United States Department of Transportation, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE EXHIBITS

## I. INTRODUCTION

Plaintiff, Mr. Bruce Harris, brings Rehabilitation Act claims against his employer, the Department of Transportation. The Department reassigned Mr. Harris to a different job when his disability prevented him from completing his original job duties. Mr. Harris argues that the Department reassigned him into a job for which he was not qualified instead of other vacant jobs for which he was qualified, thereby discriminating against him by failing to provide a reasonable accommodation for his disability. Mr. Harris also argues that his reassignment constituted retaliation against him because he requested a reasonable accommodation. The Department moves for summary judgment on both claims. Because genuine issues of material fact preclude summary judgment, the Court denies the Department's motion.

---

[1] Secretary Chao is substituted as a defendant in accordance with Federal Rule of Civil Procedure 25(d).

## II. BACKGROUND[2]

Mr. Harris is a person with hearing impairments. Compl. ¶ 7, ECF No. 1; Harris Dep. 5–6, ECF No. 17-4; Harris Decl. ¶ 1, ECF No. 19-26. The Department of Transportation hired Mr. Harris in 2012 as a Program Officer and Grant Manager within the Federal Motor Carrier Safety Administration (FMSCA). Harris Decl. ¶ 6, ECF No. 19-26. His Program Officer and Grant Manager role at FMSCA was a GS-13 position in the 2101 Transportation Specialist series. Harris Decl. ¶ 6, ECF No. 19-26. FMCSA is one of several operating administrations, or modes, within the Department.[3] Harris Decl. ¶ 6, ECF No. 19-26.

While working as a Program Officer and Grant Manager, Mr. Harris used a variety of accommodations for his hearing impairment, including sign-language interpreters and a video-phone system. Harris Dep. 18:13–24, ECF No. 17-4; Harris Decl. ¶ 7–8, ECF No. 19-26. At first, these accommodations were apparently successful in enabling Mr. Harris to perform his job. However, in early 2014 Mr. Harris began to experience difficulties participating in conference calls of twenty-five to thirty-five people. Poarch Aff. at 4–7, ECF No. 19-18; Harris Dep. 27:15–24, ECF No. 17-4; Harris Decl. ¶ 9, ECF No. 19-26. Participation in these calls was an increasing

---

[2] Some documents relating to this case were released pursuant to a protective order. *See* Protective Order, ECF No. 13. The Court cites exclusively to documents which have already been placed into the public record through inclusion in the parties' unsealed filings.

[3] The Department of Transportation currently comprises 11 operating administrations: the Maritime Administration (MARAD), the Pipeline and Hazardous Materials Safety Administration (PHMSA), the Office of the Secretary of Transportation (OST), the Federal Highway Administration (FHWA), the Saint Lawrence Seaway Development Corporation (SLSDC), the Office of Inspector General (OIG), the Federal Railroad Administration (FRA), the Federal Transit Administration (FTA), the National Highway Traffic Safety Administration (NHTSA), the Federal Aviation Administration (FAA), and FMCSA. *Our Administrations*, U.S. Department of Transportation (last updated Feb. 2, 2017), https://www.transportation.gov/administrations. The Volpe Center, an agency within the Department of Transportation—but apparently not an operating administration—is also mentioned in this case. *Cf. About Us*, Volpe: The National Transportation Systems Center (last updated May 4, 2017), https://www.volpe.dot.gov/about-us.

component of Mr. Harris's job. Harris Decl. ¶ 9, ECF No. 19-26. Even though sign-language interpreters were active during the conference calls, Mr. Harris still struggled to fully participate because, among other issues, the interpreters had difficulty when multiple people spoke simultaneously or when speakers did not identify themselves. Harris Dep. 27–30, 36, ECF No. 17-4; Harris Decl. ¶ 9, ECF No. 19-26.

Mr. Harris and his supervisor discussed a variety of possible accommodations to improve Mr. Harris's experience with the conference calls. *See* Poarch Dep. 76:18–78:2, ECF No. 17-5; Harris Dep. 34:15–36:6, ECF No. 17-4. However, Mr. Harris concluded that none were effective and, in the spring of 2014, requested reassignment to a different job as a reasonable accommodation for his disability. Poarch Aff. at 6–7, ECF No. 19-18; Harris Dep. 51, ECF No. 17-4; *see also* Email from Bruce Harris to Brandon Poarch (April 28, 2014, 4:37 PM), ECF No. 17-8 (requesting reasonable accommodations due to the conference call issue); Email from Brandon Poarch to Bruce Harris (May 28, 2014, 9:35 AM), ECF No. 17-10 (stating that the reassignment process had begun).

Before initiating the formal process, the Department searched informally for an appropriate reassignment but did not identify any. Quade Aff. at 5, ECF No. 21-2. The Department then initiated its formal process, known as a reasonable accommodation reassignment search. Quade Aff. at 5, ECF No. 21-2. The Department has a procedure for such searches that is memorialized in Department of Transportation Order 1011.1A. *See generally* Procedures for Processing Reasonable Accommodation Requests from DOT Job Applicants and Employees with Disabilities (DOT Order 1011.1A) (last updated Sept. 19, 2014), https:// www.transportation.gov/sites/dot.gov/files/docs/Procedures_for_Processing_Reasonable_

Accommodation_Requests_by_Job_Applicants_and_Employees_with_Disabilities_2014_0.pdf;
*see also* Order 1011.1A § 3.4, ECF No. 17-12.

In theory, the Department's process works as follows. First, the human resources specialist in the employee's home operating administration collects application materials, including a résumé and the employee's areas of interest. Horne Dep. 10:9–12, 14:4–12, 16:19–22, ECF No. 17-2. Based on those materials, human resources identifies a list of grades and series the employee would be qualified for. Horne Dep. 10:9–12, 17:5, ECF No. 17-2. The application materials and qualifications are then sent to the selective placement program manager for the entire Department. Horne Dep. 14:19–21, 23:3–6, ECF No. 17-2; Walker Dep. 4:16–19, ECF No. 17-3. The selective placement program manager distributes the materials to a group consisting of the "selective placement coordinators in each one of the modes for the Department of Transportation." Walker Dep. 17:6–13, ECF No. 17-3. The selective placement coordinators seek out vacancies for which the employee is qualified, and, if any are found, contact either the selective placement program manager or the human resource specialist in the employee's operating administration. Burnham Dep. 70:10–16, ECF No. 19-12.

The Department attempted to use this process to reassign Mr. Harris, and accordingly collected Mr. Harris's application materials. Horne Aff. at 3, ECF No. 18-3. Human resources determined that Mr. Harris was qualified[4] for the following series and grade levels:

---

[4] The Court uses the language present in the documents in the record, which state "Mr. Harris is qualified for the following series and grade levels." As discussed *infra* at Part IV.A.3, the Department disputes whether Mr. Harris was truly qualified for all of the grades and series listed here and argues that this determination by human resources is not a final determination of Mr. Harris's qualifications.

| Series | Grades | Title |
|--------|--------|-------|
| 0343 | GS 13 | Management / Program Analyst / Supervisory – in either grants, finance, financial[5] |
| 505 | GS 13 | Financial Manager |
| 501 | GS 13 | Financial Administrator / Supervisory |
| 510 | GS 13 | Accountant / Supervisory |
| 511 | GS 13 | Auditor |
| 1109 | GS 13 | Grants Management Specialist / Supervisory |

Email from Lisa Horne to Jonni Burnham and Duronne Walker (Aug. 6, 2014, 1:55 PM), ECF

No. 19-28;[6] *see also* Horne Dep. 32:11–18, ECF No. 18-5 ("Q: . . . [D]o you have any role in

determining whether or not he's qualified for the position? A: That was already determined.

Q: Okay. And when you said that, you were pointing to the email that you sent on August 6th,

2014, at 1:55 p.m.? A: Yes."); Horne Aff. at 3, ECF No. 18-3 ("Michael Barber conducted an

analysis of [Mr. Harris's] qualifications . . .").

The Department's selective placement program manager emailed Mr. Harris's materials

and qualifications to all of the selective placement coordinators.[7] Walker Dep. 16:14–20:10, ECF

---

[5] In the exhibit in the record, a word appears to be missing after "financial." This detail does not appear significant to the outcome of this case.

[6] This list appears to be based on a separate "HR Evaluation of Skills" performed for Mr. Harris. *See* HR Evaluation of Skills 6-26-2014, ECF No. 17-14. The list used by the Department omits the references to GS-14 positions included in the HR Evaluation of Skills, likely because of the Department's policy not to promote through reasonable accommodation reassignments. *See* Horne Dep. 28:4–14, ECF No. 17-2.

[7] The record indicates that emails were sent to representatives of the 11 modes listed *supra* in note 3, and the Volpe Center: MARAD, PHMSA, OST, FHWA, SLSDC, OIG, FRA, FTA, NHTSA, FAA, FMCSA, and Volpe. *See, e.g.*, ECF No. 17-15 (search email to selective placement coordinators). Mr. Harris's briefing at times refers to 13 modes. *See, e.g.*, Pl.'s Opp'n at 4, ECF No. 18. Mr. Harris apparently reaches this number by adding the Surface Transportation Board (STB), which was part of the Department of Transportation until the end of 2015 but is currently an independent agency. *Overview of the STB*, Surface Transportation Board (last visited June 12, 2017), https://www.stb.gov/stb/about/overview.html.
Although some documents in the record list the STB within the components to be contacted for reassignment searches, ECF No. 19-11, it is not clear that anyone from STB was ever emailed concerning Mr. Harris's search. *See, e.g.*, ECF No. 17-15 (search email to selective placement coordinators). Although the Court notes this inconsistency, none of Mr. Harris's arguments rely on the possible omission of the STB search, and the Court thus does not resolve it.

No. 17-3; Email from Duronne Walker to multiple recipients (Aug. 19, 2014, 7:18 AM), ECF No. 17-15 (search email to selective placement coordinators). The email requested that all selective placement coordinators respond within thirty days. Email from Duronne Walker to multiple recipients (Aug. 19, 2014, 7:18 AM), ECF No. 17-15. After the thirty-day period had closed, the selective placement manager emailed the selective placement coordinators again, stating that each coordinator "absolutely 'must' respond to this inquiry. Also, keep in mind that in the near future documentation may be asked of you justifying your responses to this request" and requesting responses within the next day. Email from Duronne Walker to multiple recipients (Sept. 22, 2014, 11:47 AM), ECF No. 17-16. It is unclear if any responses were received to the first request, and neither party argues that any potential job vacancies were identified.

Apparently unsatisfied with the results of the first search, a manager at the Department's Disability Resource Center performed a second search by emailing the selective placement coordinators again. Burnham Dep. 76:21–78:5, ECF No. 17-9; Email from Jonni Burnham to multiple recipients (Oct. 3, 2014, 3:59 PM), ECF No. 17-18 (second search email to selective placement coordinators). Unlike the previous email, this email provided in the body the list of grades and series that "FMCSA has determined that [Mr. Harris] may be qualified for." Email from Jonni Burnham to multiple recipients (Oct. 3, 2014, 3:59 PM), ECF No. 17-18. The second search required the selective placement coordinators to respond within sixty days. Email from Jonni Burnham to multiple recipients (Oct. 3, 2014, 3:59 PM), ECF No. 17-18.

Only three of the operating administrations responded to the second search.[8] Email from Jonni Burnham to multiple recipients (Dec. 3, 2014, 9:51 AM), ECF No. 17-17("[O]nly three

---

[8] Although the Department identifies no evidence in the record that more than three modes replied, several of the Department's employees stated their belief that all of the modes always reply. *See* Quade Dep. 33:1–11, ECF No. 19-27; Walker Dep. 22:8–15, ECF No. 19-13.

[operating administrations] have responded to the request below.").[9] Other documents in the record suggest that this poor response rate is par for the course in the Department's reasonable accommodation reassignment searches. ECF No. 19-11.[10] Indeed, the selective placement manager stated that, in his time in his job, "two to five percent" of the people he had searched for were reassigned. Walker Dep. 20:11–22, ECF No. 17-3.

None of the three responses identified any potential vacancies for Mr. Harris. Two of the modes stated they had found no appropriate positions, and the third attached a list of all open positions—none of which appeared to be appropriate. Email from Jonni Burnham to Brandon Poarch (Dec. 3, 2014, 9:20 AM), ECF No. 17-17 ("FHWA responded that they are under a hiring freeze. OIG responded that their search did not find any positions for which the employee is qualified. OST provided a list of all their vacancies[,] most of which are for series and grades that do not meet the search criteria . . ."); *see also* Quade Aff. at 5, ECF No. 21-2 ("The outcome was that no other modes responded that they had a position."). This result confused Mr. Harris's

---

[9] Indeed, evidence in the record suggests that the FAA not only did not respond, but did not complete a search at all because the email was sent to the wrong person. *See* Burnham Dep. 92:18–93:6, ECF No. 19-12 ("Q: Well, the bottom line here is that during the whole time of this search, even the extended week, nobody in FAA was actually doing a search, correct? A: It doesn't appear so."); *cf.* Email from Cesar Collantes to Jonni Burnham (Dec. 12, 2014, 12:02 PM), ECF No. 19-15.

[10] A table collecting the results of five other reasonable accommodation reassignment searches indicates that—out of the 13 modes—only four, five, or six modes responded to each search.
This conclusion assumes that the common "No response/no vacancies" label used by the Department actually means no response, as suggested by the document as a whole. First, whenever "No response/no vacancies" is used, the corresponding date field is empty, but when any other comment describes a response the date of the response is filled in. Second, many of the other comments (with dates) use more specific language to indicate that no positions were available ("No positions available in requested area," "Agency is on a hiring freeze," "Not successful in finding a vacant position," etc.), suggesting that the "No response/no vacancies" label was not used when a mode actually replied indicating that no vacancies were available. *Cf.* Burnham Dep. 19:5–8, ECF No. 19-12 ("Q: Now, suppose [the modes] determine there isn't a position? A: They would typically respond by email and say we don't have any vacancies.").

supervisors in the Department. *See, e.g.*, Quade Aff. at 5, ECF No. 21-2 ("It is difficult to believe that there were not vacant positions in the entire Department for which he would qualify.").

Throughout the reassignment process, Mr. Harris identified many jobs on USAJOBS that he believed he was qualified for, and emailed the postings to his supervisor and others. *See, e.g.*, Email from Bruce Harris to Brandon Poarch (July 3, 2014, 9:52 AM), ECF No. 18-8; Email from Bruce Harris to Brandon Poarch (Aug. 7, 2014, 11:08 AM), ECF No. 18-10; Email from Bruce Harris to Brandon Poarch (Aug. 13, 2014, 12:03 PM), ECF No. 18-11; Email from Bruce Harris to Lisa Horne (Aug. 25, 2014, 4:33 PM), ECF No. 18-12; Email from Bruce Harris to Lisa Horne (Aug. 29, 2014, 5:34 PM), ECF No. 18-13; Email from Bruce Harris to Brandon Poarch (Oct. 2, 2014, 11:11 AM), ECF No. 19-1.

No evidence in the record suggests that human resources or the selective placement coordinators took any action concerning the vacancies identified by Mr. Harris. The manager of the Department's Disability Resource Center said that, if it appeared that appropriate jobs were not being identified through the search process, the human resources specialist in the employee's operating administration or a supervisor in human resources would be the appropriate person to follow-up. Burnham Dep. 71:9–73:4, ECF No. 19-12. Here, no evidence in the record indicates that such a follow-up was performed. *See, e.g.*, Horne Dep. 44:11–18, ECF No. 18-5 (testimony of FMSCA's human resources specialist that she did not know if Mr. Harris was considered for the positions he identified); Allen Dep. 24:3–25:11, ECF No. 19-14 (FMSCA's acting director of human resources testifying that the human resources specialist did not respond directly to his question about whether she had followed up on the positions Mr. Harris had identified).

In the end, no jobs were identified through the formal agency-wide search. The Department then pursued the "non-traditional alternative[]" of reassigning Mr. Harris into the

Office of Acquisitions, still within FMSCA. Quade Aff. at 5, ECF No. 21-2. The acquisitions job

was in either the 301 or 1102 series[11]—neither of which was included in the list of series Mr.

Harris was qualified for according to human resources. *Cf.* Email from Lisa Horne to Jonni

Burnham and Duronne Walker (Aug. 6, 2014, 1:55 PM), ECF No. 19-28. Mr. Harris was offered

the choice between accepting the reassignment and staying in his current position with a performance

work plan. Poarch Aff. at 10, ECF No. 19-18. Mr. Harris accepted the reassignment "under

protest" because he believed it would reduce his opportunities for promotion. Email from Bruce

Harris to Brandon Poarch (Jan. 23, 2015, 11:38 AM), ECF No. 17-24 (accepting the acquisitions

position "under protest" because "[Mr. Harris] would be at least 5 years away from a GS-14

promotion, plus the on[e] year in the 0301 position, effectively making this position a demotion

with reduced promotional possibilities"); *see also* Notification of Personnel Action, ECF No. 17-

25. Mr. Harris was officially offered reassignment to the Office of Acquisitions as a GS-13 in

January of 2015. Letter from Brandon Poarch to Bruce Harris (Jan. 5, 2015), ECF No. 17-23.

---

[11] The position that Mr. Harris was initially offered was in the 301 series. Letter from Brandon Poarch to Bruce Harris (Jan. 5, 2015), ECF No. 17-23. It was apparently expected that after a year he would be moved into the 1102 series, which deals with contracting. *See* Adams Aff. at 5, ECF No. 21-3 ("[Mr. Harris] had to be assigned to a GS-301 Program Specialist position because he did not meet the specialized experience for a GS-1102 position."); Email from Brandon Poarch to Bruce Harris (Jan. 8, 2015, 5:32 PM) ("FMCSA cannot provide you with a direct transfer to a GS-1102 . . . . Then, after one year of acceptable performance . . . the letter assures you that you would be reclassified as a GS-1102/13 Acquisitions Specialist."). It appears that Mr. Harris was indeed eventually reclassified into the 1102 series. Personnel Action Form, ECF No. 17-25.

It also appears that Mr. Harris was initially expected to work as a contracting specialist, but was later moved into the purchasing agent track based on his prior work experience. *See* Adams Aff. at 6, ECF No. 21-3 ("[The new Director] said she wanted to switch [Mr. Harris] to a GS-1102 in the purchasing agent track, which is different from contracting specialist, where we originally planned to have him work. . . . He was qualified for this position. He ha[d] enough experience to do purchasing and [it would] allow him to progress more quickly than if he were in contracting."). Any differences between a contracting specialist and purchasing agent do not appear to be at issue in this lawsuit.

Once in the Office of Acquisitions job, the parties dispute whether Mr. Harris was assigned work suitable for a GS-13. According to Mr. Harris, he "was not assigned grade 13 work, but instead, was assigned duties that are more typically performed by a GS-8 level employee." Harris Decl. ¶ 14, ECF No. 19-26; *see also* Harris Dep. 77:16–19, ECF No. 17-4 ("I found out . . . it would take me three to five years to obtain enough experience to function at the GS-13 level" in acquisitions); Harris Decl. ¶ 15, ECF No. 19-26 (stating that Mr. Harris "can neither do the work nor advance professionally because . . . it would take at least 5 years to gain the experience necessary to function at the GS-13 level in this area").

Other evidence in the record, especially the statements of Mr. Harris's supervisor in acquisitions, indicates that he was assigned work below the GS-13 level. *See, e.g.*, Baker Aff. at 5, ECF No. 18-7 ("Mr. Harris had no prior experience in the area of contracting, acquisitions and/or procurement. Consequently, any person who cross-trains into the field of contracting . . . must start work projects, which equate in complexity to either a GS-07 or GS-08 grade level. Mr. Harris having no prior contracting experience should start his on the job training at the beginning, which equates to being assigned tasks similar to those a GS-07 or GS-08 would accomplish."); Baker Aff. at 6, ECF No. 18-7 ("It is true that [Mr. Harris] has not been given work commensurate with a GS-13 because he does not have the skills, experience or certification to perform work at the GS-13 level."); Baker Aff. at 7, ECF No. 18-7 ("[M]ost persons who serve as GS-13 procurement professionals typically have acquired at least 3 years of procurement experience. Overall it is not realistic for Mr. Harris to think he will catch up with the rest of the federal government GS-13 1102 procurement professionals in just 52 short weeks when the other federal government GS-13 1102s have worked in the procurement career-field for a minimum of 3 to 4 years."); *see also* Cooper Dep. 14:2–15:2, ECF No. 21-7 (stating that "two

to three years' worth of training" would be required for a person in Mr. Harris's position "to be a Grade 13 contracting officer" and that it would be "possible" for a person to start in contracting and be able to function as a Grade 13 in two to three years).

The Department argues, to the contrary, that Mr. Harris was sometimes able to perform GS-13 work. Reply Supp. Def.'s Mot. Summ. J. (Def.'s Reply) at 8, ECF No. 21; *see also* Cooper Dep. 12:17–22, ECF No. 21-7 ("I knew from initial discussions with [Mr. Harris] that he had really no contracting experience, but that wasn't a requirement for him to come onto my staff"); Baker Dep. 19:10–12, ECF No. 21-8 ("Q: And in your view, is he able to do the duties of an 1102 at the GS-13 level? A: Sometimes yes, sometimes no.").

Mr. Harris filed an EEO complaint concerning his allegations and received a Final Agency Decision on December 11, 2015. Compl. ¶ 4, ECF No. 1. Mr. Harris initiated this suit shortly after, raising claims of failure to provide a reasonable accommodation and retaliation. *See generally* Compl. The Department does not argue that Mr. Harris has failed to exhaust his administrative remedies. *Cf.* Memroandum [sic] P. & A. Supp. Def.'s Mot. Summ. J. (Def.'s MSJ) at 9, ECF No. 17-1. The discovery period having concluded, the Department now moves for summary judgment on both claims. *See generally* Def.'s MSJ.

### III.  LEGAL STANDARD

#### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the nonmovant. *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007). The burden is on the nonmovant to identify specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When considering a motion for summary judgment, the Court analyzes all underlying facts and inferences in the light most favorable to the nonmovant, *Anderson*, 477 U.S. at 255, and "eschew[s] making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

### B. The Rehabilitation Act

Mr. Harris pursues two claims under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*—discrimination based on failure to provide a reasonable accommodation, and retaliation.

#### 1. Discrimination

"To establish a prima facie case of discrimination based on the failure to accommodate under the Rehabilitation Act, a plaintiff must proffer evidence from which a reasonable fact-finder could find that (1) she had a qualifying disability within the meaning of the statute, (2) her employer had notice of the disability, (3) with reasonable accommodation, she could perform the essential functions of the position, and (4) she requested an accommodation but the employer denied her request."[12] *Doak v. Johnson*, 19 F. Supp. 3d 259, 273–74 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015) (citation omitted).

A reasonable accommodation may consist of reassignment to a new job. *See Norden v. Samper*, 503 F. Supp. 2d 130, 145 (D.D.C. 2007) (citing 42 U.S.C. § 12111(9)(B) and 29 C.F.R. § 1630.2(o)); 29 C.F.R. § 1630.2(o)(2)) ("Reasonable accommodation may include but is not

---

[12] "[F]ailure to accommodate claims are not subject to the *McDonnell Douglas* burden-shifting framework. *Doak v. Johnson*, 19 F. Supp. 3d 259, 273–74 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998)); *see also Davis v. George Wash. Univ.*, 26 F. Supp. 3d 103, 114 (D.D.C. 2014).

limited to: . . . reassignment to a vacant position.");[13] 42 U.S.C. § 12111 ("The term 'reasonable accommodation' may include . . . reassignment to a vacant position . . ."). Indeed, when an "accommodation cannot be made in the employee's current position, the federal employer *must* consider the feasibility of reassigning the disabled employee to a vacant position." *Norden*, 503 F. Supp. 2d at 145–46 (emphasis added) (citing *Carr*, 23 F.3d at 530 and *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998)).

The D.C. Circuit has outlined the applicable considerations in reassigning an employee pursuant to a request for accomodation. First, the employee must, "with or without reasonable accommodation, [be able to] perform the essential functions of the employment position to which [he or] she seeks reassignment." *Aka*, 156 F.3d at 1301 (citing *Daugherty v. City of El Paso*, 56 F.3d 695, 698–99 (5th Cir. 1995) (addressing the standard in an ADA case, which has identical standards to the Rehabilitation Act, *see supra* note 11)). The reassignment "can only be to an existing, vacant job for which the plaintiff is qualified, and positions to which other employees have a 'legitimate contractual or seniority right' are not considered 'vacant.'" *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008) (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999) (en banc)).

The regulations instruct employers to "reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a

---

[13] The Court cites to the regulations governing the Americans with Disabilities Act because, as in effect at the times relevant to this case, the federal regulations governing the Rehabilitant Act stated "[t]he standards used to determine whether section 501 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 791), has been violated in a complaint alleging nonaffirmative action employment discrimination under this part shall be the standards applied under Titles I and V (sections 501 through 504 and 510) of the Americans with Disabilities Act of 1990, as amended (42 U.S.C. 12101, 12111, 12201), as such sections relate to employment. These standards are set forth in the Commission's ADA regulations at 29 CFR part 1630." 29 C.F.R. § 1614.203(b) (2016).

reasonable amount of time." 29 C.F.R. § Pt. 1630, App. Furthermore, "[r]eassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities." 29 C.F.R. § Pt. 1630, App. However, the employer is not required to reassign an employee to a job that would constitute a promotion, and the "employer has the authority to pick and choose which appropriate vacant job is to be offered to the otherwise qualified disabled employee." *Alston*, 571 F. Supp. 2d at 84 (quoting *Midland Brake*, 180 F.3d at 1170); *see also Johnson v. Brown*, 26 F. Supp. 2d 147, 151 (D.D.C. 1998) ("Thus, the regulations do not require an employer to promote an employee to a higher wage level; nor do they require an employer to create a position where no vacancy exists." (citing *Mengine v. Runyon*, 114 F.3d 415, 418 (3rd Cir. 1997)). Indeed, not only is there no requirement that an employer *promote* through reassignment, but an employer may *demote* through reassignment if no equivalent positions are available. *See* 29 C.F.R. § Pt. 1630, App. ("If . . . there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation" then "[a]n employer may reassign an individual to a lower graded position.").

It is the plaintiff's duty to "demonstrate that there existed some vacant position to which he [or she] could have been reassigned." *Aka*, 156 F.3d at 1304 n.27; *see also Alston*, 571 F. Supp. 2d at 82 (requiring the plaintiff to show "that a reasonable accommodation was possible and would have led to a reassignment position"—in other words, the plaintiff "bears both the burden of production and the burden of persuasion on the question whether a suitable vacancy existed at the time [she] sought transfer." (first quoting *Midland Brake*, 180 F.3d at 1174, then quoting *Jackan v. N.Y. State Dept. of Labor*, 205 F.3d 562, 567 (2d Cir. 2000)); *Faison v. Vance-Cooks*,

896 F. Supp. 2d 37, 60 (D.D.C. 2012) ("[I]t is the plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions." (citations omitted)).

Throughout the reassignment process, both parties are obligated to proceed in a "reasonably interactive manner." *Norden v. Samper*, 503 F. Supp. 2d 130, 145–46 (D.D.C. 2007) (citing *Midland Brake*, 180 F.3d at 1173). "Ultimately, the touchstone of the reassignment inquiry is 'reasonableness.' 'Everything that an employer must do in terms of a reassignment is modified by the adjective reasonable, just as that adjective modifies any other accommodation required by the employer under the ADA.'" *Alston*, 571 F. Supp. 2d at 84 (quoting *Midland Brake*, 180 F.3d at 1171); *see also Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) ("Determining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry.").

## 2. Retaliation

Establishing a prima facie case of retaliation under the Rehabilitation Act requires showing that "(i) [the plaintiff] engaged in statutorily protected activity; (ii) [the plaintiff] suffered a materially adverse action by [his or her] employer; and (iii) a causal link connects the two." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (internal quotation marks and citations omitted).

When the plaintiff presents only circumstantial evidence of retaliation, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Id.* Under that framework, the plaintiff must "first establish a prima facie case of retaliation." *Id.* (internal quotation marks and citations omitted). If the plaintiff establishes a prima facie case, "the burden of production shifts to the employer to produce a 'legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)). If the employer produces such a nondiscriminatory reason, then the plaintiff must demonstrate a genuine dispute

"either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).

## IV. DISCUSSION

The Department moves for summary judgment, asserting that it (1) did not discriminate against Mr. Harris because it reasonably accommodated him by reassigning him to the Office of Acquisitions, and (2) did not retaliate against him for seeking a reasonable accommodation.[14] As to Mr. Harris's discrimination claim, genuine issues of material fact concerning which positions Mr. Harris was offered, whether the acquisitions position was a *de facto* demotion, and whether other positions that Mr. Harris was qualified for were available prevent summary judgment. As to Mr. Harris's retaliation claim, the Court finds that Mr. Harris has presented a prima facie case and cast doubt on the Department's nondiscriminatory reason. Under the *McDonnell Douglas* burden-shifting test, Mr. Harris therefore evades summary judgment on his retaliation claim. The Court addresses each issue in turn.

### A. Discrimination

The Department asserts that it reasonably accommodated Mr. Harris by offering to reassign him either to the Grants Management Office (GMO) or into acquisitions, either of which it claims would constitute a reasonable accommodation. It further argues that, even if the acquisitions job was inferior to Mr. Harris's previous job, it had no better options available to accommodate him. However, genuine issues of material fact exist as to whether the Department

---

[14] Mr. Harris also moved for leave to file exhibits out of time. Pl.'s Mot. File Exs., ECF No. 19. The Department consented to the motion. Pl.'s Mot. File Exs. The Court therefore grants the motion and has considered the out-of-time exhibits in reaching this opinion.

offered Mr. Harris the GMO position and whether that position would have accommodated Mr. Harris. The Court also concludes that Mr. Harris has demonstrated a genuine issue of material fact concerning whether the acquisitions position was inferior to his existing job. Because the acquisitions job may therefore constitute a *de facto* demotion, the Court considers whether such a demotion would have been appropriate on the grounds that no equivalent jobs were available to Mr. Harris. Ultimately, the Court concludes that genuine issues of material fact also exist as to whether other jobs for which Mr. Harris was qualified were vacant, and therefore denies the Department summary judgment on Mr. Harris's discrimination claim.

### 1.  The Grants Management Office Position

The Department claims that it satisfied its obligation to provide a reasonable accommodation by offering Mr. Harris a position in the GMO that he declined. Def.'s MSJ at 3, 13, ECF No. 17-1. Mr. Harris argues, to the contrary, that he was not offered the GMO position during the reassignment search, and that in any event the position would not have been a reasonable accommodation because it would have required the same conference calls as his previous job. Because genuine issues of material fact exist on both issues, the GMO position does not justify summary judgment for the Department.

To suffice as a reasonable accommodation, an employer must actually offer the employee a position, not provide merely an illusory discussion of alternative work. *See, e.g.*, *Norden v. Samper*, 503 F. Supp. 2d 130, 162 (D.D.C. 2007) ("[T]he [defendant's] attempt to 'reassign' [the plaintiff] did not satisfy its obligations under the Rehabilitation Act because it merely invited her to apply for the job; it did not offer her a reassignment." (citing 29 C.F.R. § 1614.203(g))); *cf. Perry-Anderson v. Howard Univ. Hosp.*, 192 F. Supp. 3d 136, 147 (D.D.C. 2016) ("[A]n employer does not dispense with its obligation to provide a reasonable accommodation under the

ADA if the employer merely allows 'an employee to apply for a job on the same basis as anyone else . . .'" (quoting *Aka v. Wash. Hosp. Center*, 156 F.3d 1284, 1304 (D.C. Cir. 1998))).

The Department and Mr. Harris agree that he was initially offered the GMO position before beginning the reassignment process. According to the Department, he was offered the GMO position for a second time after seeking reassignment, Def.'s Reply at 7, ECF No. 21, which Mr. Harris disputes, Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. (Pl.'s Opp'n) at 2 n.1, 15, ECF No. 18; Pl.'s Statement Dispute Def.'s Statement Mat. Facts, ECF No. 18-20 ¶ 3. The evidence in the record establishes that there is a genuine issue of material fact as to whether Mr. Harris was re-offered the GMO job after requesting reassignment in April of 2014. *See* Email from Bruce Harris to Brandon Poarch (April 28, 2014, 4:37 PM), ECF No. 17-8. No direct evidence of an offer, such as an email or testimony about a specific conversation, appears in the record. Some evidence suggests Mr. Harris was offered the GMO job during the reassignment process. Mr. Harris acknowledged in his deposition that he had conversations with Mr. Poarch about the GMO as part of the reasonable accommodation process, although it is not clear if these conversations rose to the level of a job offer. *See* Harris Dep. 65:18–66:3, ECF No. 17-4 ("Q: Did anybody talk to you about a position [in the GMO]? A: They did. . . . Q: And this was as part of the attempt to find a reassignment that's [a] reasonable accommodation? A: Yes and no. He was trying to bypass that process. But we knew right from the beginning that [the GMO] position has the same speakerphone problem."); *see also* Kuo Aff. at 3, ECF No. 21-5 (discussing what may or may not be the same job as being discussed during the "[s]ummer of 2014" but rejected by Mr. Harris because "[the] Office of Financial Management, under the CFO Office. . . . was under the [GMO]"); Email from Brandon Poarch to Bruce Harris (Jan. 8, 2015, 5:32 PM), ECF No. 21-6 ("Since this process [of reassignment] has started, FMCSA has pursued

with you options to transfer you to [the GMO] (for which you were initially hired and for which you are qualified as a GS-1109/13) . . ."); Poarch Aff. at 8, ECF No. 21-1 ("We told him about this vacancy [in the GMO] but [Mr. Harris] did not want it.").

But other evidence in the record suggests that the Department did not re-offer the GMO job to Mr. Harris. *See* Poarch Aff. at 9, ECF No. 21-1 (stating that, as of "July 21, [2014,]" they "had no plans to reassign [Mr. Harris] to GMO" because of the problems between Mr. Harris and Mr. Bethel); Quade Aff. at 5, ECF No. 21-2 (ruling out the possibility of finding a job for Mr. Harris in GMO because "that was not an option"). However, Mr. Harris, unlike his counsel, does not explicitly deny being offered the GMO job after beginning the reassignment process. *Compare* Pl.'s Opp'n ("Nor was Mr. Harris offered to work in the FMCSA [GMO] as a reasonable accommodation. That position had been discussed in July 2013 . . . long before Mr. Harris requested a reassignment as a reasonable accommodation."), *with* Harris Decl., ECF No. 19-26 (not addressing GMO position), *and* Harris Dep. 65:18–66:3, ECF No. 17-4 ("Q: Did anybody talk to you about a position [in the GMO]? A: They did. . . . Q: And this was as part of the attempt to find a reassignment that's [a] reasonable accommodation? A: Yes and no. He was trying to bypass that process."). Analyzing the evidence in the record in the light most favorable to Mr. Harris, as it must, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Court finds that a genuine issue of material fact exists as to whether he was offered the GMO position at the relevant time.

Furthermore, even if the Department had offered Mr. Harris the GMO job during the reassignment process, there are genuine issues of material fact as to whether the GMO job would have been effective accommodation. Some evidence in the record indicates that the GMO job would have caused the same conference call issues that initially necessitated reassignment. *See*

Harris Dep. 66:2–67:13 ("[W]e knew right from the beginning that [the GMO] position has the same speakerphone problem. In fact, a[] GMO representative would be on that same call."). Although the Department attempts to argue that Mr. Harris was not certain of the exact contours of conference calls from the GMO side, Harris Dep. 67:15–18 ("Q: Did the GMO official have the same role on those conference calls as you had . . .? A: I don't know."), Def.'s MSJ at 7 n.8, there is a genuine issue of material fact as to whether or not the GMO job, if it involved conference calls, would be a reasonable accommodation.[15]

It is unclear if the Department also claims that it should receive summary judgment because of various other job opportunities it offered Mr. Harris. *See* Def.'s MSJ at 13 ("*Most notably*, Mr. Harris was offered the opportunity to work in the [GMO] . . . ." (emphasis added)); ECF No 17-1 at 7 (describing conversations about possible jobs for Mr. Harris in the Internal Audit Division, the National Training Center, and Human Resources). However, because genuine issues of material fact exist as to whether Mr. Harris was ever offered a job in any of those assorted areas, none justifies summary judgment.[16] *Cf.* Pl.'s Opp'n at 15–16.

---

[15] The Department also contends that Mr. Harris has waived any argument that the GMO position would involve conference calls because he did not raise it in his opposition brief. Def.'s Reply at 7 n.1, ECF No. 21; *see generally* Pl.'s Opp'n, ECF No. 18. However, the D.C. Circuit has held that "a motion for summary judgment cannot be 'conceded' for want of opposition. . . . The District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring) and citing Fed. R. Civ. P. 56(e)(3)). This Court thus investigates for itself if the record contains a genuine issue of material fact.

[16] The Court briefly summarizes the evidence in the record about each opportunity. For the internal controls position, most of the evidence in the record shows that Mr. Harris was not actually offered a job. *See* Quade Dep. 26:14–20, 30:15–31:1, ECF No. 17-6 ("[t]he two of them had a meeting and [Mr. Quade] th[ought] it was the conclusion of both of them at the end of the meeting that Bruce Harris would not be a fit in the Internal—a good fit in the Internal Controls Office"); Quade Dep. 31:6–8, ECF No. 17-6 ("Q: So he was never offered a position in the Internal Controls? A: No."); Reed Dep. 9:13–11:6, ECF No. 17-7 (stating that based on a conversation between Mr. Harris and another employee, "they mutually agreed that [Internal

## 2.  The Acquisitions Job

The Department argues that Mr. Harris's eventual reassignment into the Office of

Acquisitions constituted a reasonable accommodation. Def.'s MSJ at 13–15; Def.'s Reply at 7–10.

Mr. Harris argues that it was not a reasonable accommodation because his lack of qualifications

forced him to perform GS-7 or GS-8 work and delayed his eligibility for a promotion. Pl.'s

Opp'n at 21–24.

The parties do not dispute that the Office of Acquisitions job provided Mr. Harris with

the same pay and benefits as he had previously received. SF-50 Notification of Personnel Action,

ECF No. 17-25 (showing that Mr. Harris was reassigned at the same grade and step and same

---

Controls] was not a good fit" and that she "d[id]n't know that there was an offer" of a job);
Harris Dep. 75:8–76:3, ECF No. 17-4 (stating that the interview ended "within a minute"
because Mr. Harris did not have a certification as an internal auditor and emphasizing that it was
"not true" that "the position was offered to [Mr. Harris]"). *But see* Adams Aff. at 4, ECF No. 21-
3 ("He had turned down an offer to work as an auditor with under [sic] the jurisdiction of the
Chief Financial Officer.").

Similarly, the evidence in the record generally indicates that Mr. Harris was not offered a
position at the National Training Center. Harris Dep. 82:24–83:16 , ECF No. 17-4 (he recalled
"[v]ery, very briefly" a conversation about an opportunity at the National Training Center, but "it
was no specific position that [was] talked about" and the conversation only lasted "a minute or
two" because "there was really nothing there"); Poarch Dep. 31:10–32:8, ECF No. 17-5 (noting
that he and another supervisor "discussed the possibility of [Mr. Harris] working at the National
Training Center for FMCSA" but he "d[id]n't recall specifically whether there was a vacancy or
not"). *But see* Adams Aff. at 4, ECF No. 21-3 ("I was able to offer him [a] position[] [with] the
National Training Center . . . . as a program specialist on course related work and training.").

Finally, the evidence is mixed as to whether Mr. Harris was offered a position in human
resources. Harris Dep. 79:12–80:10, ECF No. 17-4 (stating that he was "asked if [he] would be
interested in something about hiring people with disabilities" but "[t]here never was a position
available" and he "never interviewed with anybody"). *But see* Adams Aff. at 4, ECF No. 21-3. "I
was able to offer him [a] position[] in HR . . . . as a program specialist working on special
emphasis programs and specific projects.").

Given that the Court cannot weigh evidence or make credibility determinations at
summary judgment, *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), it cannot resolve
these disputes in favor of the Department, and summary judgment is therefore inappropriate.

total salary); Letter from Brandon A. Poarch to Bruce Harris (Jan. 5, 2015), ECF No. 17-23 (offering Mr. Harris reassignment into acquisitions as a GS-301/13).

However, a genuine dispute of material fact clearly exists over whether Mr. Harris was able to perform GS-13 work in the Office of Acquisitions. *See supra* Part II; *see also, e.g.*, Harris Decl. ¶ 14 (stating that Mr. Harris "was not assigned grade 13 work, but instead, was assigned duties that are more typically performed by a GS-8 level employee"); Baker Aff. at 6, ECF No. 18-7 ("It is true that [Mr. Harris] has not been given work commensurate with a GS-13 because he does not have the skills, experience or certification to perform work at the GS-13 level."). *But see* Cooper Dep. 12:17–22, ECF No. 21-7 ("I knew from initial discussions with [Mr. Harris] that he had really no contracting experience, but that wasn't a requirement for him to come onto my staff."); Baker Dep. 19:10–12, ECF No. 21-8 ("Q: And in your view, is he able to do the duties of an 1102 at the GS-13 level? A: Sometimes yes, sometimes no.").

In addition, Mr. Harris argues—without dispute from the Department—that the acquisitions job limited his opportunities for promotion. *See, e.g.*, Harris Dep. 77:16–19 ("I found out . . . it would take me three to five years to obtain enough experience to function at the GS-13 level" in acquisitions); Baker Aff. at 7, ECF No. 18-7 ("[M]ost persons who serve as GS-13 procurement professionals typically have acquired at least 3 years of procurement experience. Overall it is not realistic for Mr. Harris to think he will catch up with the rest of the federal government GS-13 1102 procurement professionals in just 52 short weeks when the other federal government GS-13 1102s have worked in the procurement career-field for a minimum of 3 to 4 years."); *see also* Cooper Dep. 14:2–15:2, ECF No. 21-7 (stating that "two to three years' worth of training" would be required for a person in Mr. Harris's position "to be a Grade 13 contracting

officer" and that it would be "possible" for a person to start in contracting and be able to function as a Grade 13 in two to three years).

Therefore, in order to prevail at summary judgment, the Department must establish that the acquisitions job was still a reasonable accommodation even if Mr. Harris performed work below the GS-13 grade level and had impaired promotion opportunities. The Department argues that this is the case because a reassignment is a reasonable accommodation "virtually as a matter of law" so long as it "does not require a significant reduction in pay and benefits." Def.'s MSJ at 13 (quoting *Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992)). Under the Department's theory, therefore, the existence of other potential positions is irrelevant as long as it placed the employee into a job with the same pay and benefits. Def.'s Reply at 9. Mr. Harris disagrees with the Department's laser focus on pay and benefits. According to Mr. Harris, whether a job is equivalent to the employee's original job should be measured on additional factors—including difficulty of work and the opportunity for promotion—and an employer may not reassign an employee to an inferior job if an equivalent job is available. Pl.'s Opp'n at 22.

The Court finds that Mr. Harris has the better position. The Department's own procedure states that "[t]he reassignment search should focus on vacant positions that are equivalent to the current job in terms of pay, grade, promotion potential, status, benefits, geographical location, and other relevant factors." DOT Order 1011.1A § 3.4, ECF No. 17-12; *see also* DOT Order 1011.1A § 3.4 ("Prior to assigning the employee to a non-equivalent position, the decision-maker must consult with the employee to determine which factors are most significant to the employee."). This clearly signals that pay and benefits are not the only relevant factors. Promotion potential—which the Department does not dispute Mr. Harris lost—is explicitly named. The Department's procedure is consistent with the ADA regulations, which require

employers to "reassign the individual to an equivalent position, in terms of pay, status, etc." but provide that "[i]f . . . there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation" then "[a]n employer may reassign an individual to a lower graded position." 29 C.F.R. § Pt. 1630, App.

Both the ADA regulations and the Department's procedure contemplate that, if no equivalent vacant position is available, an employee may be reassigned to an inferior position. They do not suggest that an employer may assign an employee to an inferior position *without* first searching for an equivalent position. Here, Mr. Harris has demonstrated at least a genuine of issue of material fact as to whether the acquisitions job was inferior because it provided fewer opportunities to perform interesting and difficult work and reduced his promotion potential. The Court thus concludes that the availability of equivalent positions is a factor in considering whether reassignment to an inferior position may be made as a reasonable accommodation. This conclusion is in harmony with other decisions in this jurisdiction that a reasonable accommodation reassignment must be "equivalent in terms of status and pay." *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008). As Mr. Harris notes, this conclusion is not in direct tension with the out-of-circuit case the Department cites because in that case there was no evidence of an available equivalent position. *See Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992) ("This may have constituted a demotion in [the plaintiff's] eyes *but given the fact that she could not fulfill the head nurse position, it was necessary* . . ." (emphasis added)); *see also* Pl.'s Opp'n at 23. Therefore, whether the acquisitions job (arguably inferior to Mr. Harris's previous job) justifies summary judgment for the Department hinges on whether jobs equivalent to Mr. Harris's previous job were available. The Court turns to that question.

### 3. Availability of Other Jobs

Mr. Harris identifies 11 job postings[17] that he claims he was qualified for and flagged during the reassignment process. *See generally* Pl.'s Opp'n; *see also* Harris Decl. ¶ 28. The Department argues that none of the 11 positions was both within his qualifications and also vacant during the reasonable accommodation search. Def.'s Reply at 10–12. Mr. Harris has demonstrated the existence of a genuine issue of material fact as to whether vacant jobs existed for which he was qualified.

The plaintiff "is required to show that vacant positions existed that were equivalent in terms of status and pay to [the former] position, and that [he or] she was qualified for those positions."[18] *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008) (citing 29 C.F.R. § 1630, App. § 1630.2(o) and *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997)).

First, the Court addresses which grades of jobs were appropriate for Mr. Harris. The Department asserts that, because an employer need not promote an employee through a reassignment as a reasonable accommodation, it could not be required to reassign Mr. Harris to any GS-14 positions. Def.'s MSJ at 15, ECF No. 17-1. Mr. Harris accepts this assertion—the 11 jobs are all either GS-13 positions or I band[19] positions (in the case of positions with the FAA).

---

[17] Mr. Harris claims to have emailed the Department about 32 jobs. *See* Pl.'s Opp'n at 8–11, ECF No. 18. Of these, Mr. Harris now produces detailed information concerning 11.

[18] However, although it is the plaintiff's burden to identify a position, the D.C. Circuit has held that an employer has "a corresponding obligation to help [the employee] identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies)." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 n.27 (D.C. Cir. 1998) (collecting cases). In this case, the scant response from the selective placement coordinators casts significant doubt on the Department's performance in service of its obligation to identify vacancies.

[19] Instead of the GS system, the FAA classifies positions using lettered bands. Mr. Harris asserts that I band equates to GS 12/13. Harris Decl. ¶ 28; *compare* Salary Table 2014-GS, ECF No. 19-8, *with* FAA Pay Bands, ECF No. 19-9. The Department apparently agrees. *See* Def.'s

*See* Harris Decl. ¶ 28, ECF No. 19-26 (identifying two grade 13 positions, a grade 12/13/14

position, seven I band positions, and a I/J band position); Pl.'s Opp'n at 7–15 (stating that Mr.

Harris identified many "Grade 13 and Grade 13 [e]quivalent" jobs); *see also* Harris Decl. ¶ 28,

ECF No. 19-26.

The Department appears to expand this argument to also apply to GS-13 positions that

"ladder" to GS-14. Laddering refers to jobs with a career path to the higher grade through a

non-competitive promotion. For example, the Court understands from the parties' briefing that a

person could be placed as a GS-13 in a position graded as GS-13/14, but later could be eligible

for a non-competitive (but not automatic) promotion to GS-14. The Department appears to argue

that it can refuse to reassign Mr. Harris to any position with a career track that reaches GS-14

because of the future promotion potential. *See* Def.'s Reply at 13 (contending that Mr. Harris

was "not eligible" for a particular position because "it [was] a ladder, target GS-14 position,

which means that the incumbent would be eligible for a noncompetitive promotion to a GS-14");

*cf., e.g.*, Adams Aff. at 4, ECF No. 21-3 ("We were not authorized to reassign him to a GS-14

position *or to a position that had a career track to GS-14*." (emphasis added)); May Dep. 51:1–7,

51:12–22 ,ECF No. 21-9 (eliminating one possible position because "[i]nasmuch as the position

is a target 14, it's not comparable to the one that [Mr. Harris] encumbered at the time of his

Reply at 13, ECF No. 21 ("This position ladders to the 'J' band, which is comparable to the GS-14
level."); Burnham Dep. 62:1–5 ("If we look at the bands for the FAA, albeit a different year . . . .
going into the I band definitely wouldn't be a promotion . . . ."). *But see* Poarch Aff. at 9, ECF
No. 19-18 ("FAA uses a different pay grade scale and there was some disagreement as to which
pay band he could qualify. [sic] Many of the positions he found himself . . . in the case of the
FAA positions, were not clearly lateral positions. In a meeting on August 22, 2014, Human
Resources (Lisa Horne) and I said we needed to defer to FAA to determine which were lateral
positions."). Because the Department does not articulate a contrary position, the Court assumes
that an I band position in the FAA would not be a promotion for Mr. Harris.

request" and explaining that a "target 14" has a "career ladder" that goes to GS-14, although that "would still require an action by the manager to promote the person").

The Court need not resolve this argument because it is new in the Department's reply.[20] *Cf.* Def.'s MSJ at 15; *see also Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 695 n.3 (D.C. Cir. 2015) (refusing to consider new arguments for irreparable injury in a movant's reply brief because the opposing party "had no opportunity to respond" and the movant "offer[ed] no reason, much less an extraordinary one, for its failure to raise these arguments in its opening brief" (citing *CTS Corp. v. EPA*, 759 F.3d 52, 60 (D.C. Cir. 2014) and *United States v. Whren*, 111 F.3d 956, 958 (D.C. Cir. 1997))).[21] Furthermore, the Court notes that the Department

---

[20] The Department suggests that it raised this argument in its summary judgment motion at page 15. *See* Def.'s Reply at 13, ECF No. 21 (arguing that "Mr. Harris was not eligible for reassignment to this position because it is a ladder, target GS-14 position, which means that the incumbent would be eligible for a noncompetitive promotion to a GS-14. It therefore would have constituted a promotion from Mr. Harris's GS-13 position in the State Programs Office. And the department's policy, which is supported by case law, provides that a reasonable-accommodation reassignment cannot result in a promotion. [*See* Def.'s Opening Br. at 15.]" (bracketed material in original) (citations omitted)). However, the Department's opening brief does not discuss laddering or target grades at all. *See* Def.'s MSJ at 14–15.

[21] The Court additionally rejects two other new arguments the Department adds in its reply concerning the jobs identified by Mr. Harris.

First, the Department objects that Mr. Harris did not "present[] his claimed qualifications to the Department during the reassignment search" or "actually request[] reassignment to any of the positions." Def.'s Reply at 2, ECF No. 21. This argument does not appear in the Department's motion for summary judgment, *cf.* Def.'s MSJ at 14–15, and therefore the Court disregards it because Mr. Harris has not had the opportunity to respond. Furthermore, the Department identifies no legal authority placing the burden on the employee to take either of these steps.

Second, the Department argues for the first time in its reply that Mr. Harris has not shown "that he could have performed the essential functions of those positions with or without an accommodation." Def.'s Reply at 12. The relevant legal authority speaks to the plaintiff's requirement to demonstrate that an equivalent position existed and that the employee was qualified, not that the employee could perform it with or without reasonable accommodations. *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008) (citing 29 C.F.R. § 1630, App. § 1630.2(o) and *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997)). Nor have other courts in this jurisdiction examined at summary judgment

offers no legal authority supporting its assertion that it may refuse to reassign an employee to a vacant position at the employee's same grade because the reassignment might someday render the employee eligible for a promotion. *See* Def.'s Reply at 15. Of course, to the extent that there are multiple equivalent positions at the appropriate grade available, the Department may freely select which to offer, and any consideration of the career ladders would be innocuous in that context. *Cf. Alston*, 571 F. Supp. 2d at 84 ("[The] employer has the authority to pick and choose which appropriate vacant job is to be offered to the otherwise qualified disabled employee." (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (1999))).

Because all of the 11 jobs include either GS-13 or I band positions, the Court therefore finds that their grades do not exclude them from consideration. Next, the Court addresses whether Mr. Harris has shown that a genuine issue of material fact exists concerning his qualifications for the 11 jobs. The Court concludes that a genuine issue of material fact exists for two reasons.

First, ten of the jobs are within the list of grades and series that Mr. Harris was found to be qualified for by human resources.[22] *Compare* Email from Lisa Horne to Jonni Burnham and Duronne Walker (Aug. 6, 2014, 1:55 PM), ECF No. 19-28, *with* Harris Decl. ¶ 28 (listing series), ECF No. 19-26. The Department's procedure states that "the employee *must* be" offered "an equivalent position . . . for which the employee is minimally qualified, per analysis by an HR

whether the employee had made a showing that she could perform the job to which she sought reassignment with or without reasonable accommodation. *See, e.g.*, *Alston*, 571 F. Supp. 2d at 85.

[22] The fifth job Mr. Harris identifies, posting FTA-TSO-2014-0059, is in the 2101 series. Harris Decl. ¶ 28 (discussing posting FTA-TSO-2014-0059). The 2101 series is not included in the human resources list. Email from Lisa Horne to Jonni Burnham and Duronne Walker (Aug. 6, 2014, 1:55 PM), ECF No. 19-28. However, the Department does not object to this posting on this ground, likely because Mr. Harris's original job as a Program Officer and Grant Manager was in the 2101 series, Harris Decl. ¶ 6, ECF No. 19-26. Because other postings for which Mr. Harris was qualified exist in the listed series, the Court does not address this issue further.

Specialist, and can perform the essential functions, with or without reasonable accommodation," if such a position exists. DOT Order 1011.1A § 3.4, ECF No. 17-12. Unfortunately, the Department's procedure does not define minimally qualified, although the term itself suggests a lenient standard. However, this "minimal qualification" appears to be satisfied by the human resources list.

The Department uses the exact language of "minimal qualification" to describe the list generated by human resources. *See* Def.'s MSJ at 5, ECF No. 17-1 ("[A] Human Resources Specialist in FMCSA . . . conducted an analysis of Mr. Harris's resume to determine those positions for which he was minimally qualified according to requirements set by the Office of Personnel Management."); Def.'s MSJ at 6 (describing the second reasonable accommodation reassignment search email as "includ[ing] a list of series and grades for which Mr. Harris was minimally qualified"); *see also* Def.'s Reply at 11 (acknowledging that the jobs Mr. Harris identifies are within the "general series and levels" for which the Department's human resources specialist found Mr. Harris was "basically qualified"); Email from Lisa Horne to Jonni Burnham and Duronne Walker (Aug. 6, 2014, 1:55 PM), ECF No. 19-28 (email from human resources specialist stating that "Mr. Harris is qualified for the following series and grade levels" and listing series and grade levels); Horne Dep. 32:11–18, ECF No. 18-5 ("Q: . . . [D]o you have any role in determining whether or not he's qualified for the position? A: That was already determined. Q: Okay. And when you said that, you were pointing to the email that you sent on August 6th, 2014, at 1:55 p.m.? A: Yes."). *But see* Horne Dep. 49:2–7, ECF No. 18-5. ("Q: [L]ooking at the jobs that Mr. Harris had identified, do you have any reason to believe that he's not qualified for these positions that he's identified? A: Additional information would be required."). Indeed, the list of grades and series is the only determination in the record of Mr.

Harris's qualifications by a human resources specialist. The record contains no analysis of the 11 (or 32) jobs by a human resources specialist. The list of grades and series, therefore, creates a genuine issue of material fact as to whether Mr. Harris was qualified for each of the jobs he identifies without reference to the specific vacancy announcements pertaining to each position.[23]

Second, even if the Court analyzed the vacancy announcements, there are genuine issues of material fact as to whether Mr. Harris was qualified for the 11 jobs. The Department argues that Mr. Harris failed to meet the "specific requirements" from each individual job posting.[24] Def.'s Reply at 11–18. The Department relies upon its counsel's analysis to discount Mr. Harris's qualifications, and does not present any findings or evidence from human resource specialists or similar members of the Department. *See* Def.'s Reply at 12–18. Upon consideration of the qualifications listed in the job postings and Mr. Harris's qualifications, the Court

---

[23] To the extent that there may be daylight between the requirement of the Department's procedure and of the Rehabilitation Act, this distinction is never articulated by the Department. The Department's procedure is intended to "support[] the Department's obligation to meet the reasonable accommodation requirements prescribed under the Rehabilitation Act of 1973, as amended." DOT Order 1011.1A at 1.

[24] The Department appears to seek an inference that Mr. Harris was not qualified because he did not receive a favorable response from the selective placement coordinators after the 11 positions were forwarded to them. *See* Def.'s MSJ at 14–15, ECF No. 17-1 ("The postings that [Mr. Harris] located were provided to the Departmental official conducting the search for suitable positions, and that official forwarded the postings to the selective-placement coordinators in each of the Department's operating administrations[, but n]one of those coordinators suggested that those positions were suitable or available to Mr. Harris."). However, the record contains no evidence that any selective placement coordinator responded at all to the positions suggested by Mr. Harris, whether favorably or unfavorably. Indeed, after the second search was implemented to cure the poor response to the first search, only three selective placement coordinators responded to the second search. Burnham Dep. 76:21–78:5, ECF No. 17-9; Email from Jonni Burnham to multiple recipients (Dec. 3, 2014, 9:51 AM), ECF No. 17-17. Similarly, it would be perverse to require Mr. Harris to submit a finding by a human resources specialist as to his qualifications. *Cf.* Def.'s Reply at 11 ("[T]here had been no finding that Mr. Harris satisfied any of [the requirements in specific job postings].").

concludes that genuine issues of material fact prevent summary judgment for the Department on the grounds that Mr. Harris was not qualified.[25]

For example, Mr. Harris identified an I band position as a Management and Program Analyst in the FAA (AWA-AHR-14-0064DB-37476). *See* 37476 Job Posting, ECF No. 19-23. The Department asserts he could not satisfy the requirement that the applicant "have the ability to be a Contracting Officer Representative (COR)," because he "only obtained COR training after his reassignment to the Office of Acquisitions." Def.'s Reply at 17 (first quoting 37476 Job Posting, ECF No. 19-23). However, the posting does not require that the applicant *already* be a COR. Instead, it specifies that the applicant "should have *the ability* to be a [COR]." 37476 Job Posting, ECF No. 19-23 (emphasis added). Mr. Harris's subsequent COR training empirically demonstrates that he had the ability to become a COR at the time of the reasonable accommodation reassignment search. Furthermore, the COR requirement is followed by "and/or be knowledgeable about working with contracts and assisting the Lead COR." 37476 Job Posting, ECF No. 19-23. This language suggests that COR expertise is permissive if the applicant is experienced with contracts and able to assist the COR. Although the Department also quotes this requirement and the requirement that the applicant have "[s]ome knowledge of personnel operations' activities," it does not explain why it believes these requirements have not been met. Def.'s Reply at 17 (quoting 37476 Job Posting, ECF No. 19-23. Because Mr. Harris previously ran his own company—including "[n]egotiat[ing] contracts with customers"—Harris

---

[25] The Department also argues that one of the 11 jobs must be set aside because the job posting closed before the reasonable accommodation reassignment search began. Def.'s Reply at 12–13, ECF No. 21 (discussing FRA.RPD-2014-0035). Because the Court finds that genuine issues of material fact exist as to Mr. Harris's qualifications for other jobs with uncontested timing, it need not resolve this issue. However, the Court suspects that the more important date is when the position was filled (or, at least, an offer was made), rather than when the job posting closed.

Résumé, ECF No. 18-1 at 8, there is at least a genuine dispute as to whether Mr. Harris is knowledgeable about contracts and personnel operations' activities. This is especially the case because Mr. Harris need only have been "minimally qualified," rather than the strongest candidate, to be placed into the position under the Department's policy. *See* DOT Order 1011.1A § 3.4, ECF No. 17-12.

Similarly, Mr. Harris identified a second I band position as a Management and Program Analyst in the FAA (AWA-AHR-14-0061WE-37272). *See* 37272 Job Posting, ECF No. 19-22. The Department argues that Mr. Harris was not qualified for this position because it required the applicant to have "experience that has led to the knowledge of human resource policies." Def.'s Reply at 16–17 (quoting 37272 Job Posting, ECF No. 19-22). The Department asserts that Mr. Harris cannot be qualified because he "has never held a human-recourses [sic] position." Def.'s Reply at 16–17. However, as Mr. Harris notes, he previously managed his own company where he "[i]nterviewed, hired and developed every one of [his] employees, performed evaluations, terminations, and layoffs." Harris Résumé, ECF No. 18-1 at 8; *see also* Harris Decl. ¶ 28 (discussing the 37272 job posting), ECF No. 19-26. Given that the job posting does not specify a particular certification or threshold of knowledge, the Court finds that genuine issues of material fact exist as to whether Mr. Harris's experiences have "led to the knowledge of human resource policies."

In a final example, Mr. Harris identified a third Management and Program Analyst position in the FAA at the I band (AWA-AHR-14-0067DB-37288). *See* 37288 Job Posting, ECF No. 19-24. The Department argues that Mr. Harris was not qualified for this position because it required "knowledge of" EEO policies, which Mr. Harris admits he was "not an expert on." Def.'s Reply at 17 (second quoting Harris Decl. at 17, ECF No. 19-26). However, Mr. Harris explains that he has been "involved with disability-related issues" for the past four decades,

including presenting to organizations, writing his MBA thesis, chairing the Fairfax County Disability Service Board, and serving as the executive director for an advocacy group for hearing-impaired persons. *See* Harris Decl. ¶ 28 (discussing the 37288 job posting); *see generally* Harris Résumé, ECF No. 18-1. These extensive experiences at the intersection of disability issues and employment create a genuine issue of material fact as to whether Mr. Harris could satisfy the "knowledge of" EEO program requirement.[26]

Based on an examination of Mr. Harris's qualifications and the requested qualifications for the 11 positions he identifies, the Court concludes that genuine issues of material fact exist as to whether Mr. Harris was qualified. This conclusion is in harmony with the decision of another court in this circuit, which found that genuine issues of material fact precluded summary judgment when it was unclear if the Rehabilitation Act plaintiff could satisfy each of the specific requirements in a job posting. *See Alston*, 571 F. Supp. 2d at 84–86. As discussed above, *supra* Part IV.A.2, the possible existence of jobs for which Mr. Harris was qualified prevents summary

---

[26] For several positions, including the 37288 job posting, the Department argues that—even if Mr. Harris was qualified—he did not adequately signal his qualifications in his original résumé. *See, e.g.*, Def.'s Reply at 17. In general, this argument lacks persuasive heft, especially given the anemic response from the Department during the "interactive process." No evidence in the record indicates that the Department followed up with Mr. Harris concerning any of the jobs that he identified prior to this litigation—despite multiple requests by Mr. Harris for such feedback. *See, e.g.*, Email from Bruce Harris to Lisa Horne (Aug. 29, 2014, 5:35 PM), ECF No. 18-6 ("It would be very helpful to hear some feedback from the modes on these positions: Do they think I am qualified or not qualified, and why."). Clearly, additional engagement with Mr. Harris during the reassignment search would have permitted the Department to learn more about Mr. Harris's qualifications at the time that it could have used that information to reassign him.

The Department's argument is especially egregious in the context of job posting 37288. After emailing his supervisor about the job posting, Mr. Harris followed-up the next day by emailing his manager two versions of his résumé, including one that "more fully describes [his] background working with persons with disabilities, ADA, Vocational Rehab Act of 1973, etc." *Compare* Email from Bruce Harris to Brandon Poarch (Oct. 3, 2014, 8:24 AM), ECF No. 18-1, *with* Email from Bruce Harris to Brandon Poarch (Oct. 2, 2014, 11:11 AM), ECF No. 19-1. The focus on the disability experiences was apparently unsolicited, and still resulted in no known feedback from the Department.

judgment on the Department's choice to place Mr. Harris in an inferior job for which he was not qualified and which impaired his opportunities for promotion.

## B. Retaliation

The Department does not dispute that Mr. Harris has presented a prima facie retaliation claim.[27] *Cf. Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (listing the elements of a prima facie retaliation claim). The Court therefore proceeds to the *McDonnell Douglas* burden-shifting test, which requires the Department to present a nondiscriminatory reason for its action.[28] *Id.* The

---

[27] Nor would such an argument be successful. The elements of a prima facie retaliation claim are that "(i) [the plaintiff] engaged in statutorily protected activity; (ii) [the plaintiff] suffered a materially adverse action by [his or her] employer; and (iii) a causal link connects the two." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (internal quotation marks and citations omitted).

Mr. Harris engaged in a protected activity—requesting a reasonable accommodation. *See id.* at 15 ("[W]e join our sister circuits in holding that the act of requesting in good faith a reasonable accommodation is a protected activity under 42 U.S.C. § 12203, which is incorporated into the Rehabilitation Act, *see* 29 U.S.C. § 791(g)."). According to Mr. Harris, his reassignment into acquisitions was a *de facto* demotion which forced him to do work he was not qualified to do and prevented him from getting a promotion. Compl. ¶ 21, ECF No. 1. Such a reassignment could constitute an adverse action. *See, e.g.*, *Norden v. Samper*, 503 F. Supp. 2d 130, 158 (D.D.C. 2007) (holding that assigning "a Fulbright Scholar who had published several research papers . . . to the full-time cataloguing of insect specimens was demeaning and transparently punitive" and could justify a retaliation claim under the Rehabilitation Act); *see also Loya v. Sebelius*, 840 F. Supp. 2d 245, 256 (D.D.C. 2012) (holding, in the Title VII context, that "a reduction in responsibilities can constitute an adverse employment action" (collecting citations)). Nor does the Department contend that the reassignment was causally unrelated to Mr. Harris's request for a reasonable accommodation. *Cf.* Poarch Aff. at 14, ECF No. 19-18 ("[Mr. Harris's] disability was indeed a factor and the reason he requested an accommodation. . . . [H]is disability and request for a reasonable accommodation were the reason for the [reassignment] process . . .").

[28] The Department also argues that Mr. Harris cannot bring a retaliation claim because the action of which he complains (his reassignment to the Office of Acquisitions) was the same action that he claims denied him a reasonable accommodation. Def.'s MSJ at 16, ECF No. 17-1. Cases in this jurisdiction have held that the denial of a request for reasonable accommodation cannot serve as the nucleus of both a discrimination claim and a retaliation claim under the Rehabilitation Act. *See, e.g.*, *Prescott-Harris v. Fanning*, No. 15-1716, 2016 WL 7223276, at *8 (D.D.C. Dec. 12, 2016) ("Notably, the denial of a request for accommodation cannot by itself support a claim of retaliation based on the request."); *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.").

Department alleges that it has presented a non-retaliatory reason for the reassignment: "The Department of Transportation reassigned Mr. Harris to the Office of Acquisitions not out of any retaliatory animus, but because he asked to be reassigned as a reasonable accommodation, the opportunity was available, and Mr. Harris had expressed enthusiasm for it." Def.'s MSJ at 16–17, ECF No. 17-1. To survive summary judgment, Mr. Harris must rebut the Department's nondiscriminatory reason. *Solomon*, 763 F.3d at 14.

Although it is certainly accurate that Mr. Harris requested reassignment, that alone does not explain why the Department reassigned him to acquisitions instead of, according to Mr. Harris, a job for which he was qualified. The Department's argument to the contrary proves too

---

However, unlike the claims at issue in *Floyd* and *Prescott-Harris*, here Mr. Harris alleges a distinct retaliatory act (reassignment to the Office of Acquisitions) in addition to the denial of his request for a reasonable accommodation (denial of reassignment to any of the jobs he identified). In other words, Mr. Harris alleges that he would have been better off had he never requested a reasonable accommodation at all. Under these circumstances, a retaliation claim is not double-counting because it arises from a separate harm. If, for example, an employee requests an office with fewer stairs as a reasonable accommodation, the wrongful denial of that request might constitute discrimination under the Rehabilitation Act. But if the employer not only wrongfully denies a move into a preferred office but also vindictively moves the employee into an unfinished basement corridor—with even more steps—a claim for retaliation may also exist.

A similar fact pattern existed in *Norden v. Samper*, where an employee with a disability requested flex time and reduced exposure to chemicals as reasonable accommodations. 503 F. Supp. 2d 130, 140 (D.D.C. 2007). The employer did not remove the employee from chemicals or allow her to work flexible hours. Instead, the employer assigned her—purportedly as an accommodation—to work "almost exclusively" with chemical-soaked specimens during a strict 8 AM to 5:30 PM schedule. *Id.* at 140–42. The court in *Norden* analyzed the employee's retaliation claims in addition to her discrimination claims under the Rehabilitation Act. *Id.* at 157–61. The court granted the employee summary judgment on her retaliation claims based on this "*de facto* demotion" after noting, as evidence of causation, that the conditions were the employer's "response to [the employee's] EEO complaint after she requested accommodations under the Rehabilitation Act." *Id.* at 159 (quoting the employer's briefing that the conditions were "offered to [the employee] by the [employer] in an attempt to resolve her EEO claims").

Mr. Harris alleges similar events here—not only did the Department, according to him, fail to reasonably accommodate him by reassigning him to a job that he identified and was qualified for, but it also retaliated by moving him into a job for which he was unqualified and where he would be unable to advance. The Court finds no structural obstacle to Mr. Harris's retaliation claims.

much by suggesting that whenever an employee can establish causation for the prima facie case (by showing that the alleged retaliation was causally linked to the request for a reasonable accommodation), that causation can also be deployed as a nondiscriminatory reason by the employer. *See Thomas v. Vilsack*, 718 F. Supp. 2d 106, 122 (D.D.C. 2010) (rejecting the employer's argument that "because Plaintiff requested a reassignment, she cannot then use that reassignment as the basis for her Title VII [retaliation] claim" because "regardless of whether she requested the reassignment, the fact that she suffered a drastic reduction, both quantitative and qualitative, in work assignments and responsibilities constituted an adverse employment action"). Similarly, although Mr. Harris does not dispute that "the opportunity was available" in acquisitions, that reason alone does not explain why Mr. Harris was reassigned into acquisitions when, as discussed above, other jobs for which he was qualified may have been available.

The Court thus reaches the Department's third reason—that Mr. Harris expressed enthusiasm for acquisitions. Mr. Harris can demonstrate a genuine issue of material fact concerning his enthusiasm for acquisitions. Some evidence in the record indicates that he was *initially* interested. *See* Poarch Dep. 41:7–10, ECF No. 17-5 ("[Mr. Harris] expressed enthusiasm regarding the Office of Acquisitions" after attending a training and after the end of the second reassignment search). However, other evidence indicates that any interest had cooled well before the reassignment. *See* Email from Bruce Harris to Brandon Poarch (Jan. 23, 2015, 11:38 AM), ECF No. 17-24 (accepting the acquisitions position "under protest" and stating that it was "not correct" that he was interested in the position, as any interest had been expressed before he fully understood that the reassignment was "essentially a demotion and also has negative concoctions [sic] on [his] career"); Harris Decl. ¶ 13, ECF No. 19-26 ("I never expressed 'enthusiasm' for [the acquisitions] position but agreed to consider it.").

The D.C. Circuit has held that a Rehabilitation Act plaintiff generally need not do more than "cast[] doubt" on the employer's nondiscriminatory reason to escape summary judgment. *See Solomon*, 763 F.3d at 15 ("Thus, [the plaintiff] casts doubt on the [employer's] proffered justification, and 'we do not routinely require plaintiffs "to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment."'" (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)). Therefore, because Mr. Harris has cast doubt on the Department's explanation that it reassigned him to work in acquisitions because of his enthusiasm, summary judgment is not appropriate.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 17) is **DENIED** and Plaintiff's Motion for Leave to File Exhibits (ECF No. 19) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 6, 2017                                         RUDOLPH CONTRERAS
                                                             United States District Judge